# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **JARRELL NEAL** | **CIVIL ACTION** |
| **VERSUS** | **CASE NO. 15-5390** |
| **DARREL VANNOY, WARDEN** | **SECTION: "G"(3)** |

## <u>ORDER AND REASONS</u>

In this litigation, Petitioner Jarrell Neal ("Petitioner"), a state prisoner incarcerated in the Louisiana State Penitentiary in Angola, Louisiana, seeks habeas corpus relief pursuant to 28 U.S.C. § 2254 from his conviction for two counts of first degree murder and the sentence of death on each count.[1] At Petitioner's request, this Court ordered an evidentiary hearing on certain claims raised by Petitioner.[2] Before the Court is Petitioner's "Motion for Partial Summary Judgment."[3] In the instant motion, Petitioner argues that the undisputed material facts establish that Petitioner was denied his Sixth and Fourteenth Amendment rights to a fair trial and due process.[4] Respondent Darrel Vannoy ("Respondent") opposes the motion.[5] Considering the motion, the memoranda in support and in opposition, the record, and the applicable law, the Court denies the motion and orders an evidentiary hearing.

---

[1] Rec. Doc. 4.

[2] *See* Rec. Docs. 66, 120, 138, 139, 160.

[3] Rec. Doc. 166.

[4] *Id.* at 1.

[5] Rec. Doc. 169.

# I. Background

## A.    *Factual Background*

On May 21, 1998, Petitioner was charged by Indictment with two counts of first degree murder in Jefferson Parish, Louisiana.[6] Petitioner was indicted with his older half-brother, Zannie Neal, and their uncle, Arthur Darby ("Darby").[7] "After Darby turned state's witness and the court severed the brothers' cases," Petitioner's case proceeded to trial by jury beginning on February 23, 1999 in the Twenty-Fourth Judicial District Court for the Parish of Jefferson.[8]

The charges relate to the murders of Greg Vickers and Fergus Robinson on March 31, 1998 at the home of Claudette Hurst in Metairie, Louisiana. At Petitioner's trial, Claudette Hurst testified that she was at home that evening with her boyfriend Fergus Robinson, her three children, her brother Carl Duncan, and a friend, Keinna Porter.[9] Hurst had fallen asleep on a sofa in the den.[10] At approximately 11:30 p.m., she was awakened by "some noise" and heard Robinson "telling someone to take it outside."[11] Hurst looked into an adjoining room and saw a person (later identified as victim Greg Vickers) with a red hood over his head kneeling on the floor and a tall, thin person dressed in black clothing aiming a rifle at Vickers.[12] Although Hurst was acquainted with Petitioner, she

---

[6] *State v. Neal*, 2000-674 (La. 6/29/01); 796 So. 2d 649, 653.

[7] *Id.* at 652.

[8] *Id.*

[9] Feb. 25, 1999 Trial Transcript at pp. 80–81.

[10] *Id*. at 82.

[11] *Id*. at 84–85.

[12] *Id*. at 85, 106–07.

testified that she never saw him on the night of the shooting.[13]

Hurst and Robinson ran to a bedroom where Carl Duncan and Keinna Porter were smoking marijuana.[14] Duncan and Robinson held the door shut against the intruder's repeated attempts to push his way into the room.[15] Unable to enter the room, the intruder fired multiple shots through the door, hitting both men.[16] Robinson suffered a fatal gunshot wound to his right thigh which severed his femoral artery.[17] Duncan was shot in the right arm but survived the injury.[18]

Greg Vickers' body was found lying near the threshold of a side door.[19] He suffered two gunshot wounds to his neck which severed his carotid artery.[20] Crime scene investigation uncovered four spent 7.62 caliber casings, four bullet holes in the door to the bedroom, and a bloody footprint on the tile.[21] Investigators did not dust for fingerprints.[22] Robinson was found holding twelve rocks of crack cocaine in his hand, and Vickers had a crack pipe in his back pocket.[23] Both victims tested positive for cocaine.[24] Testimony was also presented to show that Robinson was a drug dealer in the

---

[13] *Id*. at 90, 110.

[14] *Id*. at 86, 116–18.

[15] *Id*. at 118.

[16] *Id*. at 119–20.

[17] *Id*. at 63.

[18] *Id*. at 120.

[19] Feb. 27, 1999 Trial Transcript at pp. 10–11.

[20] Feb. 25, 1999 Trial Transcript at p. 40.

[21] Feb. 26, 1999 Trial Transcript at p. 144.

[22] *Id*. at 156.

[23] *Id*. at 177–78; Feb. 27, 1999 Trial Transcript at pp. 36–37.

[24] Feb. 25, 1999 Trial Transcript at pp. 60, 69.

area and Vickers was a frequent customer.[25]

During this time, Seneca Johnson, a next-door neighbor who was seven-weeks pregnant, and her boyfriend, Larry Osborne, were returning home from a nearby Shell station.[26] While they were sitting in Osborne's car, the couple heard numerous gunshots and Osborne saw two men wearing ski masks running down the sidewalk.[27] As the men approached his car, Osborne noticed one of the men carrying a rifle.[28] Osborne pushed Johnson's head down and leaned over her but a bullet struck Johnson in the buttocks.[29]

At the same time, an off-duty Jefferson Parish Sheriff's deputy, Derrick McGee, was dropping his father off at home around the corner from the Hurst residence.[30] Deputy McGee testified that he heard numerous gunshots and saw a black Toyota 4–Runner driving away "at a high rate of speed."[31] Deputy McGee began following the 4–Runner in his marked police cruiser.[32] After observing the 4–Runner run a stop sign and a red light, Deputy McGee activated his lights and siren and radioed for backup, and a vehicle driven by Deputy Bourgeois joined the pursuit.[33]

During the chase, the deputies observed a black male (later identified as Petitioner Jarrell

---

[25] Feb. 27, 1999 Trial Transcript at pp. 10–11.

[26] Feb. 25, 1999 Trial Transcript at pp. 161–62.

[27] *Id*. at 153, 162.

[28] *Id*. at 153.

[29] *Id*. at 162–63.

[30] Feb. 26, 1999 Trial Transcript at pp. 6, 16.

[31] *Id*. at 17.

[32] *Id*. at 19.

[33] *Id*. at 20–23.

Neal) lean out of the passenger's window and begin shooting at them with an AK–47.[34] Moments later, Petitioner fell out of the 4–Runner and began running towards a nearby drainage canal.[35] After a brief chase, deputies arrested Petitioner and recovered the AK–47.[36] Ballistics tests later showed that casings recovered from inside the 4–Runner and bullets recovered from Fergus Robinson's body were fired from the same AK–47.[37]

While deputies were arresting Petitioner, the driver of the 4–Runner (later identified as Arthur Darby) jumped out of the vehicle and ran to nearby houses, where he hid for about 15 minutes until a K–9 unit located him.[38] Both Darby and Petitioner were arrested and taken to Charity Hospital for treatment.[39] At the time of their arrests, Petitioner was wearing khaki pants and Darby was wearing a black sweater and jeans.[40] Deputies also arrested Zannie Neal who was sitting in the backseat of the 4–Runner.[41] A subsequent search of the 4-Runner yielded a .38 Colt revolver on the driver's side floorboard, a maroon ski mask, a Pittsburgh Steelers baseball cap, one live 7.62 round, and four spent 7.62 casings.[42]

As mentioned above, Darby testified for the State at Petitioner's trial. In exchange for his

---

[34] *Id*. at 27, 63–64.

[35] *Id*. at 27.

[36] *Id*. at 29; Feb. 26, 1999 Trial Transcript at p. 69.

[37] Feb. 27, 1999 Trial Transcript at pp. 55–58.

[38] Feb. 26, 1999 Trial Transcript at pp. 106–09.

[39] *Id*. at 97.

[40] *Id*. at 53; Feb. 26, 1999 Trial Transcript at p. 225.

[41] Feb. 26, 1999 Trial Transcript at p. 108.

[42] *Id*. at 165–67.

testimony, Darby pled guilty to two counts of manslaughter and was sentenced to twenty years' imprisonment.[43] At Petitioner's trial, the State posited that the shootings had been motivated by a drug debt owed by Franklin McQueen to Zannie Neal.[44] McQueen was the stepfather of Claudette Hurst and had stayed at Hurst's home in the past but was not there on the night of the offense.[45]

At Petitioner's trial, Darby testified that Jarrell and Zannie Neal came to his house between 9:30 and 10:00 p.m. on the night of the murders.[46] According to Darby, Zannie told him that "he had a little drama" and "might need a driver."[47] Zannie also told Darby that someone owed him money for drugs.[48] Darby testified that Zannie was driving, he was in the front seat, and Petitioner was in the back seat.[49] After they had gone about a block, Zannie asked Darby if he had his .38 pistol, which he did not.[50] Zannie told Darby he might need it so they returned to Darby's house to retrieve the pistol.[51]

When they arrived at the Hurst residence, Darby testified that Zannie told him to get in the driver's seat.[52] According to Darby, Petitioner Jarrell Neal exited the vehicle with the AK–47 and

---

[43] *Id.* at 207.

[44] Feb. 25, 1999 Trial Transcript at p. 24.

[45] *Id.* at 91.

[46] Feb. 26, 1999 Trial Transcript at p. 208.

[47] *Id.* at 209.

[48] *Id.*

[49] *Id.* at 212.

[50] *Id.*

[51] *Id.*

[52] *Id.* at 213.

went inside the house with Zannie.[53]  Moments later, Darby heard numerous gunshots and Petitioner and Zannie Neal came running back to the 4–Runner.[54]  Darby also stated that when the men returned, Petitioner was holding the AK–47 and Zannie had a pistol.[55]  Darby testified that Zannie was wearing a red ski mask and Petitioner was wearing a Steelers cap.[56]  According to Darby's testimony, Petitioner indicated that he had shot someone in the house, and Zannie told him that his gun jammed.[57]  Darby further testified that as they fled from the scene Petitioner said "the ni\*\*er was down bad for trying to play him, but now he crying like a little b\*\*ch."[58]  Darby also testified that it was Petitioner who shot at the police during the getaway chase.[59]

On February 27, 1999, Petitioner was convicted of two counts of first degree murder.[60]  The penalty phase began on March 1, 1999.[61]  At the sentencing hearing, the State called Fergus Robinson's mother and brother and Greg Vicker's mother and co-worker to provide victim impact statements.[62]  The defense called seven witnesses, including Petitioner's parents and maternal grandparents, to describe his childhood and relationship with his 3-year-old son.[63]  After the

---

[53] *Id*. at 213–14.

[54] *Id*. at 215.

[55] *Id*.

[56] *Id*. at 215, 224.

[57] *Id*. at 216.

[58] *Id*.

[59] *Id*. at 218.

[60] Feb. 27, 1999 Trial Transcript at p. 162.

[61] Mar. 1, 1999 Sentencing Transcript.

[62] *Id*.

[63] *Id.*

sentencing hearing, the jury unanimously recommended a sentence of death.[64] With respect to each count, the jury found that the following aggravating circumstances warranted a death sentence: (1) Petitioner was engaged in the perpetration or attempted perpetration of an aggravated burglary; (2) Petitioner was engaged in the attempted distribution, exchange, sale, or purchase of a controlled dangerous substance; and (3) Petitioner knowingly created a risk of death or serious bodily harm to more than one person.[65] On June 4, 1999, the state trial court imposed the death sentences.[66]

## B.    *Procedural Background*

On June 29, 2001, the Louisiana Supreme Court affirmed Petitioner's conviction and sentence.[67] Petitioner filed a petition for writ of certiorari before the United States Supreme Court, which was denied on March 18, 2002.[68] On May 13, 2002, Petitioner's request for rehearing was also denied by the United States Supreme Court.[69]

On May 23, 2002, Petitioner filed a pro se application for post-conviction relief with the state trial court.[70] On May 31, 2002, the state trial court dismissed the application because it found that Petitioner had not established entitlement to appointed counsel.[71] On October 3, 2003, the Louisiana

---

[64] *Id*. at 129–32.

[65] *Id*. (citing La. Code Crim. Pro. 905.4(a)(1), (4), (11)).

[66] Jun. 4, 1999 Sentencing Transcript.

[67] *Neal*, 796 So. 2d at 653. On September 21, 2001, the Louisiana Supreme Court granted, in part, Petitioner's request for rehearing to clarify its opinion relative to an assignment of error regarding a jury instruction. *Id*. at 663–64.

[68] *Neal v. Louisiana*, 535 U.S. 940 (2002).

[69] *Neal v. Louisiana*, 535 U.S. 1075 (2002).

[70] State Rec., Vol. XXI of XXXIII, Pro Se Application for Post-Conviction Relief (May 23, 2002).

[71] State Rec., Vol. XXI of XXXIII, Trial Court Order (May 31, 2002).

Supreme Court vacated the trial court's order.[72] The Louisiana Supreme Court found that Petitioner was entitled to post-conviction counsel and directed the trial court to give Petitioner's counsel a reasonable opportunity to prepare and litigate expeditiously an application for post-conviction relief.[73]

In 2011, post-conviction counsel supplemented the post-conviction relief application before the state trial court.[74] On October 9, 2013, the state trial court dismissed Petitioner's claims.[75] On April 17, 2015, the Louisiana Supreme Court denied Petitioner's related writ application without written reasons.[76] Petitioner filed a petition for writ of certiorari before the United States Supreme Court, which was denied on January 11, 2016.[77]

Petitioner filed this federal habeas petition on February 10, 2016.[78] Petitioner raises twenty-one grounds for relief: (1) Petitioner's due process rights were violated by the State's suppression of material favorable evidence and impeachment information under *Brady v. Maryland*; (2) the State violated *Napue v. Illinois* by failing to correct false and misleading testimony of state witnesses; (3) trial counsel was ineffective for failing to object to the prosecution's repeated statements to the jury that Arthur Darby's testimony was "the truth;" (4) trial counsel performed ineffectively by failing to impeach Arthur Darby with available impeachment evidence; (5) trial counsel was ineffective for

---

[72] *State ex rel. Neal v. Cain*, 2002-2258 (La. 10/3/03); 871 So. 2d 1071.

[73] *Id.*

[74] State Rec., Vol. X of XXXIII, Supplemental Petition for Post-Conviction Relief and Motion for Evidentiary Hearing.

[75] State Rec., Vol. XX of XXXIII, Order Denying Application for Post-Conviction Relief, Oct. 9, 2013.

[76] *State v. Neal*, 14-KP-0259 (La. 4/17/2015), 168 So. 3d 391.

[77] *Neal v. Louisiana*, 577 U.S. 1069, 136 S.Ct. 793 (2016).

[78] Rec. Doc. 4.

failing to challenge the State's forensic evidence; (6) prosecutorial misconduct violated Petitioner's right to a fair trial; (7) Petitioner's due process rights were violated by the State's improper introduction of other crimes evidence; (8) the State struck multiple qualified African-American jurors under the guise of discriminatory pretext in violation of the Equal Protection Clause; (9) extrajudicial information violated Petitioner's right to a fair trial and to confront the witnesses against him due to counsel's ineffective assistance at voir dire; (10) the trial court impermissibly granted multiple challenges for cause, ensuring that the jury was unconstitutionally biased toward imposing the death penalty; (11) trial counsel was ineffective for failing to investigate and prepare for the guilt phase of trial; (12) Petitioner's right to confrontation was violated by the admission of hearsay evidence at his trial and trial counsel was ineffective for failing to challenge the hearsay evidence; (13) trial counsel was ineffective for failing to investigate and present powerful and readily-available mitigation evidence; (14) Petitioner's Eighth and Fourteenth Amendment rights were violated when the jury was impermissibly told and instructed multiple times that their verdict was not the final determination of Petitioner's sentence; (15) Petitioner's conviction, obtained through improper jury instructions, is a violation of due process and trial counsel was ineffective for failing to object to the jury instructions; (16) Petitioner's death sentence rests on insufficient evidence of the aggravating circumstances; (17) trial counsel was ineffective for failing to challenge and explain the State's evidence of Petitioner's prior criminal history; (18) Petitioner's execution would violate the Eighth Amendment to the United States Constitution; (19) Petitioner's execution is constitutionally excessive; (20) cumulative error caused by ineffective assistance of counsel requires reversal; and (21) cumulative error caused by the State's withholding of favorable material evidence requires reversal.[79] Respondent filed a response

---

[79] *Id.*

to the habeas corpus petition on July 15, 2016.[80]

On November 18, 2016, Petitioner filed a motion requesting leave to file an amendment to the petition for writ of habeas corpus to add a claim that both his trial and post-conviction counsel were ineffective for failing to investigate a key witness, Emmett Taylor ("Taylor"), who could have testified that Arthur Darby admitted that his testimony was not the truth.[81]  Respondent opposed the motion.[82]  On May 2, 2017, the Court granted the motion to amend.[83]  On July 1, 2017, Respondent filed a response to the amended petition.[84]

On January 12, 2017, Petitioner filed a "Motion for Evidentiary Hearing."[85]  Petitioner noticed the motion for submission on June 7, 2017.[86]  On April 19, 2017, Respondent filed an opposition to the motion.[87]  On July 19, 2017, with leave of Court, Petitioner filed a reply brief in further support of the motion for an evidentiary hearing.[88]  On August 28, 2017, the Court granted Petitioner's motion to the extent it requested a hearing on Petitioner's procedurally defaulted claims raised under *Martinez v. Ryan*.[89]

---

[80] Rec. Doc. 12.

[81] Rec. Doc. 27.

[82] Rec. Doc. 45-1 at 1.

[83] Rec. Doc. 53.

[84] Rec. Doc. 60.

[85] Rec. Doc. 35.

[86] Rec. Doc. 35-2.

[87] Rec. Doc. 51.

[88] Rec. Doc. 61.

[89] Rec. Doc. 66.

On January 29, 2019, the Court called a status conference to discuss the status of the case.[90] Considering Petitioner's counsel's representation that additional time was needed to investigate the case, the Court issued an Order staying the case.[91]

On February 25, 2019, Petitioner filed a "Motion for Leave to File Amendment to Petition for Habeas Corpus."[92] Petitioner sought leave of Court to amend the habeas petition to raise four additional claims.[93]

In the motion to amend, Petitioner noted that he received leave of Court to conduct DNA testing of evidence retained by the Jefferson Parish Sheriff's Office Crime Lab.[94] Petitioner asserted that his counsel had received preliminary findings showing that there is a reasonable likelihood that the blood found on the left Nike brand tennis shoe Darby was wearing on the night of the murders came from one of the victims, Greg Vickers.[95] In light of this additional evidence, Petitioner sought leave of Court to amend the habeas petition to raise the following claims: (23) Petitioner is actually innocent of the murders of Gregory Vickers and Fergus Robinson; (24) both trial and post-conviction counsel were ineffective for failing to conduct DNA testing on the thread created by the JPSO Crime lab to preserve blood evidence recovered from Darby's left shoe; (25) the cumulative effects of the *Brady* evidence requires reversal; and (26) the cumulative error caused by ineffective assistance of

---

[90] Rec. Doc. 90.

[91] Rec. Doc. 93.

[92] Rec. Doc. 94.

[93] Rec. Doc. 94-4.

[94] *Id.* at 1.

[95] *Id.* at 2.

counsel requires reversal.[96]  Respondent opposed the motion.[97]  On April 29, 2019, the Court granted the motion to amend.[98]  On July 1, 2019, Respondent filed a response to the amended petition.[99]

On August 13, 2019, the Court called a status conference to discuss the status of the case.[100] During the status conference, the Court set the evidentiary hearing for January 21, 2020.[101]  The Court also ordered that the evidentiary hearing would include claims involving new evidence asserted in the amended petition for habeas relief.[102]

On September 4, 2019, the Court granted a motion to substitute counsel filed by Respondent.[103]  On October 29, 2019, the Court called another status conference for the parties to provide the Court with an update on the status of the case.[104]  At that time, counsel for Respondent indicated that Respondent intended to file a motion to continue the evidentiary hearing.[105]  On December 23, 2019, the Court granted a motion to continue filed by Respondent,[106] and set the evidentiary hearing for April 21, 2020.[107]  On April 14, 2020, the Court continued the evidentiary

---

[96] *Id.* at 7–12, 14.

[97] Rec. Doc. 98.

[98] Rec. Doc. 104.

[99] Rec. Doc. 112.

[100] Rec. Doc. 119.

[101] *Id.*

[102] *Id.*

[103] Rec. Doc. 123.

[104] Rec. Doc. 126.

[105] *Id.*

[106] Rec. Doc. 138.

[107] Rec. Doc. 139.

hearing due to the COVID-19 pandemic.[108] On April 21, 2020, the Court held a status conference for the parties to provide the Court with an update on the status of the case.[109] The Court set the evidentiary hearing for June 30, 2020.[110]

On May 5, 2020, Petitioner filed the instant Motion for Partial Summary Judgment.[111] On May 18, 2020, Respondent filed an opposition to the motion.[112] On June 2, 2020, Petitioner, with leave of Court, filed a reply brief in further support of the motion.[113] On June 11, 2020, Petitioner filed a motion to continue the evidentiary hearing due to the COVID-19 pandemic.[114] On June 12, 2020, the Court granted the motion and continued the evidentiary hearing.[115]

## II. Parties' Arguments

### A.    *Petitioner's Arguments in Support of the Motion for Partial Summary Judgment*

In the instant motion, Petitioner argues that the undisputed material facts establish that he was denied his Sixth and Fourteenth Amendment rights to a fair trial and due process.[116] Petitioner asserts that the prosecution failed to disclose material impeachment evidence and other favorable evidence contradicting the testimony of the prosecution's key witness, Arthur Darby.[117] Petitioner contends

---

[108] Rec. Doc. 156.

[109] Rec. Doc. 159.

[110] Rec. Doc. 160.

[111] Rec. Doc. 166.

[112] Rec. Doc. 169.

[113] Rec. Doc. 173.

[114] Rec. Doc. 175.

[115] Rec. Doc. 176.

[116] Rec. Doc. 166 at 1.

[117] *Id.*

that the value of this evidence—viewed cumulatively—undermines confidence in the jury's verdicts in light of the State's evidence at trial.[118] Therefore, Petitioner moves for partial summary judgment on the *Brady* claims.[119] "Because this claim provides clear-cut grounds for relief, [Petitioner asserts that] it would be in the interest of judicial economy if this Court would issue partial summary judgment without the need to rule on the other legally and factually complex claims in [the] Petition and Amended Petitions."[120]

Specifically, Petitioner submits that there is no genuine issue of material fact in dispute and there is a reasonable probability that the result of the proceeding would have been different had the undisclosed evidence been before the jury, in light of the following undisputed facts:

(1) Arthur Darby testified at Mr. Neal's 1999 trial that Mr. Neal and his brother committed this murder while Darby remained in the vehicle;
(2) A shoe collected by the State as evidence and identified as being seized from Darby tested positive for the presence of blood, and samples of the blood taken from his shoe were saved for DNA testing;
(3) affidavits submitted by Mr. Neal establish that trial counsel never received a copy of the serology report;
(4) DNA testing establishes that the blood of the victim, Greg Vickers, was found on the Nike shoe attributed by the JPSO Chain of Custody and numerous additional law enforcement documents to Darby;
(5) Arthur Darby gave a conflicting version of the events in a statement taken by members of the Jefferson Parish District Attorney's Office just days before the start of trial, including a statement that Jarrell Neal did not have a weapon when he left the vehicle; and
(6) Forensic shoeprint analysis conducted by the State found that Zannie Neal's Nike shoe could not be excluded as the source of a bloody shoeprint found near Gregory Vickers' body at the scene.[121]

---

[118] *Id.*

[119] *Id.* at 2.

[120] *Id.*

[121] Rec. Doc. 166-1 at 3.

According to Petitioner, if the serology and DNA test results connecting Darby to the scene of the crime and Darby's prior inconsistent statements had been presented to the jury, there is a reasonable probability that the verdict or sentence would have been more favorable to Petitioner.[122] When viewed in the light most favorable to the Respondent, Petitioner contends that there is no genuine issue of material fact in dispute and Petitioner is entitled to summary judgment and the issuance of the writ of habeas corpus as a matter of law.[123]

To the extent that the *Brady* claims were adjudicated on the merits in state court, Petitioner argues that the state court's decision was based on an unreasonable determination of the facts in light of the evidence or an unreasonable application of clearly established federal law.[124] Further, Petitioner asserts that the *Brady* claims have "been fundamentally changed and strengthened by the DNA analysis of the blood on Darby's shoe and results matching the victim—which was not before the state court due to the ineffectiveness of post-conviction counsel."[125] Because *Brady* claims must be considered cumulatively, Petitioner contends that the ultimate ruling of the state court denying relief is unworthy of deference.[126]

According to Petitioner, the parties are in agreement that Darby's February 22, 1999 police statement was not turned over to the defense at trial.[127] Moreover, Petitioner notes that the state trial

---

[122] *Id*.

[123] *Id*.

[124] *Id*. at 20.

[125] *Id*.

[126] *Id*.

[127] *Id*. (citing Rec. Doc. 12 at 15).

court affirmatively found that there were two *Brady* statements contained on the audiotape.[128] However, the state trial court in post-conviction found that the prior statement was actually disclosed to defense counsel at trial.[129] Petitioner contends that this was an unreasonable determination of the facts in light of the evidence before the state trial court.[130]

Petitioner also argues that the state trial court unreasonably found that the shoeprint analysis report did not exclude Petitioner as the source of a bloody shoeprint.[131] Petitioner asserts that the JPSO crime lab found that evidence item #78, described as Petitioner's black work boots, was "not like the pattern of the partial print" on the tile, and that the pattern of Zannie Neal's black Nikes "cannot be excluded as the possible origin of the partial print."[132] Therefore, Petitioner argues that the only reasonable reading of the report is that his boots were excluded as the source of the bloody shoeprint.[133]

Next, Petitioner notes that the state court's only finding with respect to the serology report, which indicated "possible blood" on Darby's shoe and noted that a sample of the possible blood was saved for DNA testing, was that the report "[did] not necessarily exculpate the defendant."[134] Petitioner asserts that this finding was an unreasonable application of clearly established federal

---

[128] *Id.*

[129] *Id.*

[130] *Id.*

[131] *Id.*

[132] *Id.* at 20–21.

[133] *Id.* at 21.

[134] *Id.*

law.[135] Petitioner contends that in order to be favorable, evidence does not have to "exculpate" the defendant—it can also inculpate an alternate suspect.[136] Petitioner asserts that the state trial court unreasonably applied the *Brady* standard by requiring him to show that the withheld evidence "necessarily exculpate[d]" him rather than showing a reasonable probability of a different result.[137]

To the extent that the state trial court found that the forensic reports were disclosed to the defense before trial, Petitioner asserts that this factual finding was unreasonable in light of the evidence before the court.[138] Specifically, Petitioner asserts that the evidence before the state trial court was: (1) an unsigned letter dated January 19, 1999; (2) a return receipt dated February 3, 1999, signed by defense attorney Ralph Barnett, which did not describe the contents of the mailing; and (3) a sworn declaration of Ralph Barnett stating that he did not recall receiving the reports but that if he had, he would have used them at trial.[139] Therefore, Petitioner argues that the state court's factual finding was unreasonable in light of the evidence before it.[140]

Finally, Petitioner claims that the prosecution suppressed the rap sheet of Keinna Porter ("Porter"), a witness against Petitioner at trial.[141] Petitioner contends that Porter's rap sheet shows a an arrest prior to Petitioner's trial.[142] Petitioner notes that the state court's ruling makes no mention

---

[135] *Id*. at 21.

[136] *Id*. (citing *Kyles v. Whitley*, 514 U.S. 419, 447 (1995)).

[137] *Id*. at 22.

[138] *Id*. at 23.

[139] *Id*.

[140] *Id*.

[141] *Id.* at 22.

[142] *Id*.

of the fact that the arrest was withheld.[143] Instead, the state court found that "[s]he pled as charged and did not receive a reduced sentence."[144] Petitioner asserts that this ruling is an unreasonable determination of facts in light of the evidence before the court, as the claim is based on the withholding of her arrest and pending charges and not the post-trial plea.[145]

In the alternative, Petitioner contends that he is entitled to habeas relief because even if the reports were provided, defense counsel was ineffective for failing to use the reports at trial.[146] Petitioner argues that his trial counsel had a duty to consult with independent forensic experts, both to potentially present in the defense's case and to properly cross-examine the State's experts.[147] Petitioner asserts that this Court need not resolve the question of whether the prosecution disclosed the reports because *Brady's* "materiality" standard "is identical to" the prejudice standard for ineffective assistance of counsel claims.[148] According to Petitioner, "[w]hether the reports were disclosed or withheld, the outcome is the same: Mr. Neal's conviction and death sentence are unworthy of confidence."[149]

Accordingly, because Petitioner was convicted and sentenced to death by a jury who never heard critical forensic evidence pointing to an alternate suspect, in addition to other impeachment information, Petitioner asserts that the resulting conviction and sentence is unconscionable and

---

[143] *Id.*

[144] *Id.*

[145] *Id.*

[146] *Id.* at 25.

[147] *Id.*

[148] *Id.* at 26 (quoting *Johnson v. Scott*, 68 F.3d 106, 109–10 (5th Cir. 1995)).

[149] *Id.*

unconstitutional.[150]

## B.    *Respondent's Arguments in Opposition to the Motion for Partial Summary Judgment*

In opposition, Respondent asserts that the claims upon which Petitioner seeks summary judgment were adjudicated on the merits by the state trial court.[151]  With regard to Petitioner's claims that the prosecution suppressed forensic testing reports, Respondent notes that the trial court found:

Upon review, the forensic reports do not necessarily exculpate the defendant or exclude him as the source of a bloody shoe print. Furthermore, the reports were provided to defense counsel in a letter sent via certified mail January 19, 1999 for which defense counsel signed acknowledging receipt. In addition, defense counsel's sworn affidavit confirms that it is his signature on the postal return receipt card.[152]

With regard to Petitioner's claims that the prosecution suppressed Arthur Darby's second audio recorded statement, the Respondent notes that the trial court found:

This claim is without merit. The defendant has not demonstrated how disclosure was untimely or prejudicial to his case. The record indicates that defense counsel had each of the statements to which the defendant refers.[153]

With regard to Petitioner's claims that the prosecution failed to disclose a prior arrest record of witness Keinna Porter, Respondent notes that the trial court found:

Defendant's claims regarding Keinna Porter are also without merit. She pled as charged and did not receive a reduced sentence. There is nothing in the record to suggest that there was a deal with Porter in exchange for her testimony or that she benefited from testifying at trial.[154]

Respondent argues that the record in this case reveals many material facts which contradict

---

[150] *Id.* at 27.

[151] Rec. Doc. 169 at 2.

[152] *Id.* at 5.

[153] *Id.*

[154] *Id.* at 6.

those in Petitioner's Statement of Facts and which preclude summary judgment in this case.[155] Considering the facts in the light most favorable to Respondent and drawing every inference in Respondent's favor, Respondent asserts that Petitioner has failed to carry his heavy burden of producing clear and convincing evidence sufficient to overcome the presumption in favor of the state court's resolution of the claims.[156]

## C.   Petitioner's Arguments in Further Support of the Motion for Partial Summary Judgment

In reply, Petitioner argues that summary judgment must be granted because "there can be no dispute [] that the evidence the jury never heard at trial would have fundamentally changed the State's case against [Petitioner], and the verdict is unworthy of confidence."[157]  Petitioner submits that "what has become clear in the course of this litigation is that regardless of whether the evidence was withheld by the prosecution, or overlooked by unprepared defense counsel, the evidence was material to the issue of guilt and/or sentence, was never presented to the jury who convicted Mr. Neal and sentenced him to death, and as such, Mr. Neal is entitled to habeas relief."[158]

Petitioner asserts that this Court must examine the evidence the State presented at trial and determine whether the withheld evidence that has been disclosed since then would have changed the result, whether as to guilt or penalty.[159]  Furthermore, even "[i]f this Court is not convinced that the evidence was in fact withheld," Petitioner contends that *Brady* "materiality" standard "is identical to"

---

[155] *Id.*

[156] *Id.*

[157] Rec. Doc. 173 at 1.

[158] *Id.* at 2.

[159] *Id.* at 17.

the prejudice standard for ineffective assistance of counsel claims.[160] Petitioner argues that "[t]here is no material dispute as to the core facts needed to resolve this issue."[161] Petitioner asserts that holding "a full-fledged evidentiary hearing delving into the matters argued by the Respondent would waste judicial resources with irrelevant matters. . . ."[162] Therefore, Petitioner requests that this Court issue partial summary judgment, finding that Petitioner "is incarcerated based on a conviction and sentence obtained in violation of his Sixth and Fourteenth Amendment rights, whether due to the State's *Brady* violation or his attorney's ineffective assistance."[163]

### III. Legal Standard

*A.    Standard of Review Under the AEDPA*

Following the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the standard of review used to evaluate issues presented in habeas corpus petitions was revised "to ensure that state-court convictions are given effect to the extent possible under law."[164] For questions of fact, federal courts must defer to a state court's findings unless they are "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[165] Pursuant to 28 U.S.C. § 2254(e)(1), "a determination of a factual issue made by a State court [is] presumed to be correct," and the petitioner has "the burden of rebutting the

---

[160] *Id.* (citing *Johnson*, 68 F.3d at 109–10).

[161] *Id.*

[162] *Id.*

[163] *Id.*

[164] *Bell v. Cone*, 535 U.S. 685, 693 (2002).

[165] 28 U.S.C. § 2254(d)(2).

presumption of correctness by clear and convincing evidence."[166]

"[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."[167] "[E]ven if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'"[168] However, "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review, and does not by definition preclude relief."[169]

A state court's determinations on mixed questions of law and fact or pure issues of law are to be upheld unless they are "contrary to, or involve[] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."[170] Regarding this standard, the U.S. Court of Appeals for the Fifth Circuit further explains:

> A state-court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent. A state-court decision involves an unreasonable application of Supreme Court precedent if the state court identifies the correct governing legal rule from the Court's cases but unreasonably applies it to the facts of the particular state prisoner's case.[171]

---

[166] 28 U.S.C. § 2254(e)(1).

[167] *Wood v. Allen*, 558 U.S. 290, 301 (2010).

[168] *Id*. (quoting *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).

[169] *Brumfield v. Cain*, 576 U.S. 305, 314 (2015) (quoting *Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003) (internal quotation marks omitted)).

[170] 28 U.S.C. § 2254(d)(1).

[171] *Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir. 2010) (citations and quotation marks omitted).

If Supreme Court case law "give[s] no clear answer to the question presented, let alone one in [the petitioner's] favor, 'it cannot be said that the state court unreasonably applied clearly established Federal law.'"[172]  Additionally, "unreasonable is not the same as erroneous or incorrect; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable."[173]

AEDPA requires "a state prisoner [to] show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement."[174]  However, the AEDPA's deferential standards of review apply only to claims adjudicated on the merits by the state courts.[175]  Claims that were not adjudicated on the merits by the state courts are reviewed "*de novo* without applying AEDPA-mandated deference."[176]

### B.   *Legal Standard on a Motion for Summary Judgment*

Summary judgment is appropriate when the pleadings, discovery, and affidavits demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[177]  To decide whether a genuine dispute as to any material fact exists, the court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the

---

[172] *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (quoting *Carey v. Musladin*, 549 U.S. 70, 77 (2006)).

[173] *Puckett v. Epps*, 641 F.3d 657, 663 (5th Cir. 2011) (internal citations and quotation marks omitted).

[174] *Burt v. Titlow*, 571 U.S. 12, 20 (2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

[175] *Henderson v. Cockrell*, 333 F.3d 592, 597 (5th Cir. 2003).

[176] *Carty v. Thaler*, 583 F.3d 244, 253 (5th Cir. 2009) (citing *Henderson*, 333 F.3d at 597).

[177] Fed. R. Civ. P. 56(a); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

evidence."[178] All reasonable inferences are drawn in favor of the nonmoving party.[179]

When ruling on a motion for summary judgment in a federal habeas case, courts "apply the ordinary summary judgment standards, except when they conflict with the habeas rules."[180] When Section 2254(e)(1)'s presumption of correctness attaches to a particular state court finding of fact, it "overrides the ordinary rule that, in a summary judgment proceeding, all disputed facts must be construed in the light most favorable to the nonmoving party."[181] Unless the petitioner "can rebut the presumption of correctness by clear and convincing evidence as to the state court's findings of fact, they must be accepted as correct."[182]

## IV. Analysis

In the instant motion, Petitioner argues that the undisputed material facts establish that he was denied his Sixth and Fourteenth Amendment rights to a fair trial and due process.[183] First, Petitioner moves for partial summary judgment on the *Brady* claims.[184] Petitioner asserts that the prosecution failed to disclose material impeachment evidence and other favorable evidence contradicting the testimony of the prosecution's key witness, Arthur Darby.[185] Petitioner contends that the value of this

---

[178] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008).

[179] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

[180] *Austin v. Davis*, 647 F. App'x 477, 483 (5th Cir. 2016) (citing *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002), *abrogated on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004)).

[181] *Id.*

[182] *Smith*, 311 F.3d at 668 (internal citations and quotation marks omitted).

[183] Rec. Doc. 166 at 1.

[184] *Id*. at 2.

[185] *Id.*

evidence—viewed cumulatively—undermines confidence in the jury's verdict.[186] In the alternative, Petitioner contends that he is entitled to habeas relief because even if the forensic and serology reports were provided, defense counsel was ineffective for failing to use the reports at trial.[187] The Court addresses each of these issues in turn.

## A.   *Suppression of Evidence Claims*

Petitioner argues that the State withheld the following six pieces of material evidence from the defense: (1) forensic reports showing that Zannie Neal's shoes could not be excluded as the source of the bloody shoeprint found at the scene;[188] (2) a serology report indicating that there was blood on Darby's shoe;[189] (3) an inconsistent prior statement of Darby;[190] (4) letters from Zannie Neal to Darby;[191] (5) evidence regarding pending charges against witness Keinna Porter and an apparent plea deal;[192] and (6) all of the initial and supplemental reports of the police officers that were prepared before trial.[193] Petitioner also asserts that the cumulative effects of the *Brady* evidence requires reversal.[194] Petitioner now moves for summary judgment on these claims.[195]

---

[186] *Id.*

[187] Rec. Doc. 166-1 at 25.

[188] Rec. Doc. 4 at 24–27.

[189] *Id.* at 27–29.

[190] *Id.* at 29–39.

[191] *Id.* at 39–41.

[192] *Id.* at 41–42.

[193] *Id.* at 42–44.

[194] Rec. Doc. 105 at 13–14. It is unclear whether this is a separate claim, as Supreme Court precedent requires that the Court must consider the cumulative effect of *Brady* evidence. *Kyles*, 514 U.S. at 421–22.

[195] Rec. Doc. 166.

### 1.     The *Brady* Standard

In *Brady v. Maryland*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused [] violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[196] The prosecutor's duty to provide favorable evidence includes impeachment evidence and exculpatory evidence.[197]  The prosecutor's duty to disclose evidence includes both evidence in its own possession and any other "favorable evidence known to the others acting on the government's behalf in the case, including the police."[198]  "[T]he duty to disclose such evidence is applicable even though there has been no request by the accused."[199]

To prevail on a *Brady* claim, Petitioner must show: (1) the prosecutor suppressed evidence; (2) the evidence is favorable to the defense; and (3) the evidence is material to guilt or punishment.[200] "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."[201]  The materiality analysis "is not a sufficiency of evidence test."[202]  "'The question is not whether the defendant would more likely than not have received a different verdict with the evidence,' or whether, 'after discounting the inculpatory

---

[196] 373 U.S. 83, 87 (1963).

[197] *United States v. Bagley*, 473 U.S. 667, 676 (1985).

[198] *Kyles*, 514 U.S. at 437.

[199] *Strickler v. Greene*, 527 U.S. 263, 279 (1999).

[200] *Brady*, 405 U.S. at 154.

[201] *Bagley*, 473 U.S. at 682.

[202] *Kyles*, 514 U.S. at 434.

evidence in light of the undisclosed evidence, there would not have been enough left to convict.'"[203] To succeed on a *Brady* claim, a defendant must "show[] that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."[204] "A *Brady* violation is more likely to occur when the impeaching evidence 'would seriously undermine the testimony of a key witness on an essential issue or there is no strong corroboration.'"[205] "When there are a number of *Brady* violations, a court must analyze whether the cumulative effect of all such evidence suppressed by the government raises a reasonable probability that its disclosure would have produced a different result."[206]

"[A] *Brady* determination is inevitably a contextual inquiry, involving questions of both law and fact."[207] A *Brady* inquiry "is intimately intertwined with the trial proceedings: because the court must judge the effect of the evidence on the jury's verdict, the *Brady* decision can never be divorced from the narrative of the trial. In addition, the court must consider not simply the withheld evidence in isolation, but also the quantity and quality of other evidence in the record."[208] "[W]hen the undisclosed evidence is merely cumulative of other evidence [in the record], no *Brady* violation occurs."[209] "Similarly, when the testimony of the witness who might have been impeached by the

---

[203] *Mahler v. Kaylo*, 537 F.3d 494, 500 (5th Cir. 2008) (quoting *Kyles*, 514 U.S. at 434–35).

[204] *Kyles*, 514 U.S. at 435.

[205] *LaCaze v. Warden Louisiana Corr. Inst. for Women*, 645 F.3d 728, 736 (5th Cir. 2011) (quoting *Rocha v. Thaler*, 619 F.3d 387, 396 (5th Cir. 2010)).

[206] *United States v. Sipe*, 388 F.3d 471, 478 (5th Cir. 2004) (citing *Kyles*, 514 U.S. at 421–22; *United States v. Freeman*, 164 F.3d 243, 248 (5th Cir. 1999)).

[207] *Id.* at 479.

[208] *Id.*

[209] *Id.* (quoting *Spence v. Johnson*, 80 F.3d 989, 995 (5th Cir. 1996)).

undisclosed evidence is strongly corroborated by additional evidence supporting a guilty verdict, the undisclosed evidence generally is not found to be material."[210] Conversely, if the impeaching evidence "would seriously undermine the testimony of a key witness on an essential issue or there is no strong corroboration, the withheld evidence has been found to be material."[211]

The state trial court found that Petitioner's *Brady* claims were meritless,[212] and the Louisiana Supreme Court denied relief without providing additional reasons.[213] When a *Brady* claim has been adjudicated on the merits by the state courts, a federal habeas court does not decide *de novo* whether a state prisoner has sufficiently proven a *Brady* violation.[214] Instead, the Court must determine "whether the state court's *Brady* determination resulted in a decision that is contrary to, or involved an unreasonable application of, clearly established federal law."[215] Therefore, on federal habeas review, a petitioner "must show that the prosecution's failure to disclose requested impeachment evidence constituted a violation of due process pursuant to *Brady*, and that the state court's application of *Brady* was unreasonable."[216]

### 2. Alleged *Brady* Violations

In the order denying post-conviction relief, the state trial court found that there was no *Brady*

---

[210] *Id.* (citing *Wilson v. Whitley*, 28 F.3d 433, 439 (5th Cir. 1994)).

[211] *Id.* (quoting *United States v. Weintraub*, 871 F.2d 1257, 1262 (5th Cir. 1989)).

[212] State Rec., Vol. XX of XXXIII, Order Denying Application for Post-Conviction Relief at p.1, Oct. 9, 2013.

[213] *State v. Neal*, 14-KP-0259 (La. 4-17-15), 168 So. 3d 391.

[214] *Dickson v. Quarterman*, 462 F.3d 470, 474 (5th Cir. 2006) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004)).

[215] *Id.* (quoting *Busby v. Dretke*, 359 F.3d 708, 717 (5th Cir. 2004)).

[216] *LaCaze v. Warden La. Corr. Inst. for Women*, 645 F.3d 728, 735 (5th Cir. 2011) (citing *Mahler*, 537 F.3d at 499).

violation with respect to the forensic and serology reports and the prior statement of Darby because each was disclosed to the defense before trial.[217] With respect to the letter from Zannie Neal, the charges pending against Keinna Porter, and the police reports, the state trial court found that although the evidence was not disclosed to the defense, no *Brady* violation occurred.[218] Each of these findings is addressed in turn.

For clarity due to the detailed facts surrounding each sub-issue, each alleged piece of *Brady* material is addressed individually below. However, the effect of *Brady* violations must be viewed cumulatively. "When there are a number of *Brady* violations, a court must analyze whether the cumulative effect of all such evidence suppressed by the government raises a reasonable probability that its disclosure would have produced a different result."[219] Therefore, the Court concludes by addressing the cumulative effects of the evidence.

> a.    *Forensic and Serology Reports*

Petitioner contends that the State withheld forensic reports, which indicated that Petitioner's shoes were excluded as the source of the bloody shoeprint found at the scene of the crime and that Zannie Neal's shoes could not be excluded as the source.[220] Petitioner also contends that the State withheld a serology report indicating that there was "the possible presence of blood" on Darby's shoe.[221] With respect to these claims the state trial court found as follows:

> Upon review, the forensic reports do not necessarily exculpate the defendant or

---

[217] State Rec., Vol. XX of XXXIII, Order Denying Application for Post-Conviction Relief at pp. 1–2, Oct. 9, 2013.

[218] *Id.* at 2.

[219] *Sipe*, 388 F.3d at 478.

[220] Rec. Doc. 4 at 24.

[221] *Id.* at 27–28.

exclude him as the source of a bloody shoe print. Furthermore, the reports were provided to defense counsel in a letter sent via certified mail January 19, 1999 for which defense counsel signed acknowledging receipt. In addition, defense counsel's sworn affidavit confirms that it is his signature on the postal return receipt card.[222]

"*Brady* claims are properly considered under § 2254(d)(1) rather than § 2254(d)(2) because they 'involve mixed questions of law and fact.'"[223] Under Section 2254(d)(1), this Court does "not decide *de novo* whether a state prisoner has sufficiently proven a *Brady* violation."[224] Instead, the Court decides whether the state court's *Brady* determination resulted in a decision that is contrary to, or involved an unreasonable application of, clearly established federal law."[225] A state-court decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."[226] A state-court decision is an unreasonable application of federal law "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case."[227]

In this case, the state trial court found that the forensic and serology reports were disclosed to the defense before trial. Of course, to succeed on a *Brady* claim, Petitioner must make the threshold

---

[222] State Rec., Vol. XX of XXXIII, Order Denying Application for Post-Conviction Relief at pp. 1–2, Oct. 9, 2013.

[223] *Reeder v. Vannoy*, 978 F.3d 272, 280 (5th Cir. 2020) (quoting *Floyd v. Vannoy*, 894 F.3d 143, 161 (5th Cir. 2018)).

[224] *Dickson*, 462 F.3d at 477 (citing *Yarborough*, 541 U.S. at 665).

[225] *Id*. at 477–78 (citing *Busby*, 359 F.3d at 717).

[226] *Megas v. Quarterman*, 281 F. App'x 330, 333 (5th Cir. 2008) (quoting *Williams*, 529 U.S. at 413).

[227] *Id*.

showing that the State suppressed the evidence.[228] Because the state trial court found that this evidence was not suppressed, this Court must determine whether that factual finding was objectively unreasonable before reaching the legal issue of whether the evidence was material.[229]

         i.       <u>Whether the factual finding that the evidence was disclosed was objectively unreasonable</u>

Petitioner asserts that the state court's factual finding that the serology and forensic reports were disclosed before trial was unreasonable in light of the evidence before the state trial court.[230] Petitioner notes that the evidence before the state trial court was: (1) an unsigned letter dated January 19, 1999; (2) a return receipt dated February 3, 1999, signed by defense attorney Ralph Barnett, which did not describe the contents of the mailing; and (3) a sworn declaration of Ralph Barnett stating that he did not recall receiving the reports but that if he had, he would have used them at trial.[231] In opposition, Respondent argues that these reports were disclosed to the defense before trial.[232]

The January 19, 1999 letter (pictured below) is addressed to Mr. Barnett and indicates that the forensic and serology reports were enclosed.[233] The letter includes a signature block for an assistant district attorney who was assigned to the case but is not actually signed.[234]

---

[228] *Brady*, 405 U.S. at 154; *Megas*, 281 F. App'x at 334.

[229] *See Megas*, 281 F. App'x at 334 (finding that the Texas Court of Appeals' holding that a letter was not suppressed because it was available to the defense was not objectively unreasonable).

[230] Rec. Doc. 166-1 at 20, 23.

[231] *Id.* at 23.

[232] Rec. Doc. 12 at 14.

[233] Rec. Doc. 112-8 at 1.

[234] *Id.*

PAUL D. CONNICK, JR.
DISTRICT ATTORNEY
TWENTY-FOURTH JUDICIAL DISTRICT
PARISH OF JEFFERSON
STATE OF LOUISIANA
January 19, 1999

STEPHEN T. WIMBERLY
FIRST ASSISTANT
DISTRICT ATTORNEY

COURTHOUSE ANNEX
GRETNA, LA 70053
PHONE: (504) 368-1020
FAX: (504) 368-4562

Ralph Barnett
239 Lavoisier St.
Gretna, LA 70053

Re: State v. Jarrell Neal et al
Case #:   98-3238

Dear Mr. Barnett:

In regards to the above captioned matter, enclosed please find:

1. Gun Shot Residue Analysis Report by A. J. Schwoeble dated 10/23/98 which I just received this date;

2. J.P.S.O. Crime Lab Analysis Report of shoe prints dated 01/06/99 prepared by Charles Krone.

3. J.P.S.O. Crime Lab Analysis Report dated 04/14/98 prepared by Louise Walzer relating to firearms, projectiles and casings match ups.

4. J.P.S.O. Analysis Report of a crack pipe dated 04/07/98 prepared by Daniel Waguespack.

5. J.P.S.O. Analysis Report dated 12/08/98 prepared by Pamela Williams relating to blood analysis; and

6. Two sketches of the scenes indicating where the Toyota 4 Runner was stopped and the location of evidence seized in the vicinity prepared by Detective Michael Tucker.

If you have any questions regarding this matter, please do not hesitate to call the undersigned.

Sincerely,

Quentin, P. Kelly
Assistant District Attorney

The U.S. Postal Service return receipt dated February 3, 1999 is signed by defense attorney Ralph Barnett but does not describe the contents of the mailing.[235]  In an affidavit dated May 2, 2011, Mr. Barnett attests that the signature on the return receipt was his.[236]  In an affidavit dated August 16, 2011, Mr. Barnett attests that he did "not recall whether or not [he] received those reports from the District Attorney's Office. [He] would, however, expect that exculpatory reports of this kind would

---

[235] Rec. Doc. 112-9 at 1.

[236] Rec. Doc. 112-10 at 1.

33

be disclosed in open court and not by mail. [He] also believe[d] that, if [he] had received these reports, [he] would have used them at trial to undermine the prosecution's case against Jarrell."[237]

Petitioner first raised the claim that the prosecution suppressed the forensic and serology reports on direct appeal.[238] The State contested Petitioner's assertion that the reports were not disclosed and submitted the January 19, 1999 letter and the return receipt from the postal service to the Louisiana Supreme Court to support the State's assertion that the materials were in fact disclosed to the defense before trial.[239] The Louisiana Supreme Court found that "[t]here is insufficient evidence in this record for this Court to determine (1) whether the defendant's trial counsel received the reports prior to trial, and (2) if he did not, whether these report contained exculpatory material under *Brady*."[240] Accordingly, the Louisiana Supreme Court determined that the "claim is relegated to post-conviction relief, where an evidentiary hearing may be conducted to develop a sufficient record on the issues raised."[241]

However, on post-conviction relief, the state trial court did not conduct an evidentiary hearing. Instead, the state trial court made a factual finding that "the reports were provided to defense counsel in a letter sent via certified mail January 19, 1999 for which defense counsel signed acknowledging receipt."[242] The only additional pieces of evidence submitted on post-conviction relief were the May

---

[237] Rec. Doc. 4-1 at 68. In a third affidavit dated February 26, 2018, Mr. Barnett confirmed this prior statement. Rec. Doc. 105-3 ("As I have stated in a previous affidavit, I do not recall if I received any scientific reports in discovery in this case.").

[238] *Neal*, 796 So. 2d at 659.

[239] *Id*. at 660.

[240] *Id*.

[241] *Id*.

[242] State Rec., Vol. XX of XXXIII, Order Denying Application for Post-Conviction Relief at pp. 1–2, Oct. 9,

2, 2011 affidavit and the August 16, 2011 affidavit of defense counsel, Ralph Barnett. As discussed above, in the May 2, 2011 affidavit, Mr. Barnett acknowledged that the signature on the return receipt was his.[243] In the August 16, 2011 affidavit, Mr. Barnett attests that he did "not recall whether or not [he] received those reports from the District Attorney's Office. [He] would, however, expect that exculpatory reports of this kind would be disclosed in open court and not by mail. [He] also believe[d] that, if [he] had received these reports, [he] would have used them at trial to undermine the prosecution's case against Jarrell."[244]

It does not appear that the Fifth Circuit has addressed this issue, but other federal circuit courts have held that "when a state court denies a request for an evidentiary hearing and then makes factual determinations, the failure to hold a hearing can, in limited circumstances, render the court's subsequent factual findings unreasonable."[245] The Ninth Circuit, for example, has repeatedly held that a state court's failure to conduct an evidentiary hearing can render the state court's factual findings deficient and not entitled to deference under the AEDPA.[246] As the Tenth Circuit recently

---

2013.

[243] Rec. Doc. 112-10 at 1.

[244] Rec. Doc. 4-1 at 68. *See supra* text accompanying note 236.

[245] *Smith v. Aldridge*, 904 F.3d 874, 882–83 (10th Cir. 2018) ("We agree that when a state court denies a request for an evidentiary hearing and then makes factual determinations, the failure to hold a hearing can, in limited circumstances, render the court's subsequent factual findings unreasonable.").

[246] *Velasquez v. Ndoh*, 824 F. App'x 498, 499 (9th Cir. 2020); *Hurles v. Ryan*, 752 F.3d 768, 790–91 (9th Cir. 2014) ("We have held repeatedly that where a state court makes factual findings without an evidentiary hearing or other opportunity for the petitioner to present evidence, the fact-finding process itself is deficient, and not entitled to deference.") (internal citations and quotation marks omitted); *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004), *overruled on other grounds by Murray v. Schriro*, 745 F.3d 984, 999–1000 (9th Cir. 2014) ("If … a state court makes evidentiary findings without holding a hearing and giving petitioner an opportunity to present evidence, such findings clearly result in an 'unreasonable determination' of the facts."); *Nunes v. Mueller*, 350 F.3d 1045, 1055 (9th Cir. 2003) (state court's factual findings must be deemed unreasonable under section 2254(d)(2) because "state court … refused Nunes an evidentiary hearing" and findings consequently "were made without … a hearing.").

explained, "failing to hold such a hearing only overcomes AEDPA's bar on relief if 'any appellate court to whom the defect [was] pointed out would be unreasonable in holding that the state court's fact-finding process was adequate.'"[247]

The facts of this case demonstrate that the state court's failure to hold a hearing rendered the state court's fact-finding process inadequate. The state court's factual finding that defense counsel "acknowledged receipt" of the January 19, 1999 letter is unreasonable in light of the evidence presented to the state court. Defense attorney Ralph Barnett acknowledged that he signed a certified mail return receipt on February 3, 1999, but the return receipt does not describe the contents of the mailing. Moreover, in an affidavit submitted to the state court, Ralph Barnett attested that he did not recall receiving the reports. On direct appeal, the Louisiana Supreme Court recognized that a hearing may be necessary on this issue "to develop a sufficient record on the issues raised."[248] Nevertheless, the state trial court did not afford an opportunity for a hearing. Because the state court's factual finding was based on this limited, conflicting evidence and the state court did not provide an opportunity for an evidentiary hearing, the Court concludes that the state trial court's fact-finding process was deficient and is not entitled to deference.[249] The state court's factual finding that the forensic and serology reports were disclosed was objectively unreasonably in light of the evidence presented in the state court proceeding.[250]

---

[247] *Smith v. Aldridge*, 904 F.3d at 883 (citing *Taylor*, 366 F.3d at 1000).

[248] *Id*.

[249] *See Hurles*, 752 F.3d at 791.

[250] 28 U.S.C. § 2254(d)(1); *Megas*, 281 F. App'x at 335.

ii.   Whether the state court's ruling was contrary to, or an unreasonable
      application of, clearly established federal law

Assuming that the forensic and serology reports were not disclosed to the defense before trial,

the state court alternatively found that "the forensic reports do not necessarily exculpate the defendant

or exclude him as the source of a bloody shoe print."[251]  This Court must determine whether the state

court's alternative ruling that the reports are not material was contrary to, or an unreasonable

application of, federal law.

The prosecutor's duty to provide favorable evidence includes impeachment evidence and

exculpatory evidence.[252]  To prevail on a *Brady* claim, Petitioner must show: (1) the prosecutor

suppressed evidence; (2) the evidence is favorable to the defense; and (3) the evidence is material to

guilt or punishment.[253]  "[E]vidence is material only if there is a reasonable probability that, had the

evidence been disclosed to the defense, the result of the proceeding would have been different. A

'reasonable probability' is a probability sufficient to undermine confidence in the outcome."[254]

Respondent argues that the forensic reports—showing that Zannie Neal could not be excluded

as the source of the bloody shoeprint—are not material because the evidence fits within the State's

theory of the case.[255]  Specifically, Respondent argues that the evidence showed that two intruders

---

[251] State Rec., Vol. XX of XXXIII, Order Denying Application for Post-Conviction Relief at pp. 1–2, Oct. 9, 2013.

[252] *Bagley*, 473 U.S. at 676.

[253] *Brady*, 405 U.S. at 154.

[254] *Bagley*, 473 U.S. at 682.

[255] Rec. Doc. 12 at 12–13.

entered the residence on the night of the murders—Petitioner and Zannie Neal.[256] Similarly, Respondent asserts that the serology report—finding the "possible presence of blood" on Arthur Darby's shoe—is not exculpatory because the same report noted the possible presence of blood on Petitioner's shoe.[257]

The only evidence supporting the State's theory that both Petitioner and Zannie Neal entered the house was the testimony of Arthur Darby.[258] Arthur Darby's testimony was also the only evidence presented to establish that Petitioner was the shooter.[259] The defense's position was that Darby murdered the victims and then falsely implicated Petitioner to avoid the death penalty.[260]

Claudette Hurst—the only eyewitness who testified at Petitioner's trial—testified that she saw one perpetrator who she described as tall, thin, and dressed in black clothing.[261] As the Louisiana Supreme Court recognized on direct appeal, the defense pointed to the following testimony to support Petitioner's claim that he remained in the car while Zannie Neal and/or Arthur Darby entered the house and killed the victims: "(1) Claudette Hurst described the shooter as a tall, thin person dressed in black clothing; (2) a deputy sheriff stated that when arrested [Petitioner] was wearing 'a light brown pair of khaki pants'; and (3) Darby admitted wearing a black sweater and blue jeans the night of the

---

[256] *Id.*

[257] *Id.* at 14–15.

[258] Trial Transcript at 1398.

[259] *Neal*, 796 So. 2d at 657–58 ("[T]he primary evidence that the defendant was the shooter is the trial testimony of the defendant's uncle, Arthur Darby.").

[260] *Id.* at 658 ("The defendant alleges that Darby murdered the victims and then falsely implicated the defendant to avoid the death penalty; in support, the defendant notes that Darby admitted on cross-examination that he would "do anything and say anything" to avoid the death penalty.").

[261] Trial Transcript at 1102, 1123–24.

murder, described himself as 'rather thin,' and acknowledged that [Petitioner] was not 'skinny' or 'thin.'"[262] The Louisiana Supreme Court rejected Petitioner's argument that the evidence was insufficient to prove his identity as the perpetrator, reasoning that "the jury heard Hurst's description of the offender and the witnesses' testimony regarding the defendant's and Darby's clothing and physique, but, nevertheless, accepted Darby's testimony implicating the defendant."[263]

The Supreme Court's decision in *Smith v. Cain* is instructive here.[264] There, the defendant was convicted of killing five people during an armed robbery based on the testimony of a single witness, Larry Boatner.[265] On post-conviction relief, the defendant argued that the State committed a *Brady* violation by failing to disclose police files containing statements by Boatner indicating that he could not provide a description of the perpetrator.[266] The Supreme Court "observed that evidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict."[267] However, because Boatner's testimony was the only evidence linking the defendant to the crime and because the undisclosed statements directly contradicted that testimony, the Supreme Court found that the undisclosed statements were material under *Brady*.[268]

Similarly, evidence that would have impeached Darby's credibility and called into question his version of events was clearly material to the defense in this case. The State's theory that both

---

[262] *Id*.

[263] *Id*.

[264] 132 S. Ct. 627 (2012).

[265] *Id.* at 629.

[266] *Id.* at 630.

[267] *Id.*

[268] *Id.*

Petitioner and Zannie Neal entered the house was supported only by the testimony of Arthur Darby. By contrast, Claudette Hurst testified that she only saw one intruder—an individual matching the physical description of Arthur Darby. Evidence that Zannie Neal left the bloody shoeprint found at the scene would have been relevant to the defense's theory that Petitioner remained in the car and did not shoot the victims.[269]

Similarly, the importance of the serology report to the defense cannot be overstated. At trial, Darby stated that he waited in the car while Petitioner and Zannie Neal went inside the house.[270] Evidence regarding the possible presence of blood on Darby's shoe would have reduced his credibility and strengthened the defense's argument that Darby was responsible for the shooting. The evidence that Darby had blood on his shoe was favorable to the defense because it would have contradicted Darby's testimony at trial that he remained in the car the entire time. For these reasons, the Court finds that this evidence was material to the defense. Therefore, assuming this evidence was not disclosed to the defense before trial, the state trial court's denial of relief was contrary to, or involved an unreasonable application of, federal law.

However, this issue cannot be resolved without an evidentiary hearing. The state court's decision denying relief rested on the factual finding that the serology and forensic reports were disclosed to the defense. As discussed above, the state court's factual finding was objectively unreasonable and not entitled to deference under the AEDPA. "A district court may refuse an evidentiary hearing where there is not a factual dispute which, if resolved in the prisoner's favor,

---

[269] *See Neal*, 796 So. 2d at 658.

[270] Trial Transcript at 1398.

would entitle him to relief."[271]  Here, the factual dispute, if resolved in Petitioner's favor, would entitle him to relief. Therefore, a hearing on this issue is necessary.

>    b.    *Arthur Darby's Statement to Police*

Next, Petitioner argues that a *Brady* violation occurred when the State withheld a recorded statement Arthur Darby made to the police.[272]  The state trial court rejected this claim.[273]  The trial court reasoned that "[t]he defendant has not demonstrated how disclosure was untimely or prejudicial to his case. The record indicates that defense counsel had each of the statements to which the defendant refers."[274]  Petitioner argues that this factual finding was unreasonable in light of the evidence presented to the state court.[275]  In the initial response filed in this case, Respondent conceded that "the court's statement that 'defense counsel had each of the statements to which the defendant refers' appears to be error."[276]  However, in the statement of material facts submitted in opposition to the instant motion, Respondent changes course and argues that "the record suggests at least portions of Mr. Darby's second statement were, in fact, disclosed."[277]  Respondent argues that "Petitioner's trial counsel specifically referenced that second audio recorded statement given by Mr. Darby and, using the contents of that statement, impeached Mr. Darby with a prior inconsistency from that

---

[271] *Coleman v. Vannoy*, 963 F.3d 429, 435–36 (5th Cir. 2020) (internal citations omitted).

[272] Rec. Doc. 4 at 29.

[273] State Rec., Vol. XX of XXXIII, Order Denying Application for Post-Conviction Relief at p. 2, Oct. 9, 2013.

[274] *Id*.

[275] Rec. Doc. 166-1 at 20.

[276] Rec. Doc. 12 at 18.

[277] Rec. Doc. 269-1 at 7.

statement."[278]

As discussed above, "*Brady* claims are properly considered under § 2254(d)(1) rather than § 2254(d)(2) because they 'involve mixed questions of law and fact.'"[279]  In this case, the state trial court found that Darby's statement was disclosed to the defense before trial. Of course, to succeed on a *Brady* claim, Petitioner must make the threshold showing that the State suppressed the evidence.[280] Because the state trial court found that this evidence was not suppressed, this Court must determine whether that factually finding was objectively unreasonable before reaching the legal issue of whether the evidence was material.[281]

> i.   <u>Whether the factual finding that the evidence was disclosed was objectively unreasonable</u>

At trial, the State represented that it had a taped copy of a February 22, 1999 interview that Arthur Darby gave to police.[282]  When the trial court asked the prosecutor if the State was willing to give a copy of the tape to the defense, the prosecutor said "No, Your Honor," and represented to the trial court that the taped interview of Darby was "totally consistent" with an April 1, 1998 statement the defense had and therefore, the defense was not entitled to it.[283]  The trial judge asked for a copy of the statement to be put into the record for appellate review.[284]  The prosecutor promised that "if we

---

[278] *Id.*

[279] *Reeder*, 978 F.3d at 280 (quoting *Floyd*, 894 F.3d at 161).

[280] *Brady*, 405 U.S. at 154; *Megas*, 281 F. App'x at 334.

[281] *See Megas*, 281 F. App'x at 334 (finding that the Texas Court of Appeals' holding that a letter was not suppressed because it was available to the defense was not objectively unreasonable).

[282] Feb. 26, 1999 Trial Transcript at p. 194.

[283] *Id.* at 197.

[284] *Id.*

can find the tape, we'll provide it to the court."[285]

Subsequently, during a bench conference, the prosecutor gave the trial judge a copy of the taped statement for in camera inspection.[286] The tape is not mentioned again in the trial transcript. However, a minute entry of the state trial court stated that the court reviewed the tape in chambers and ruled that there were two *Brady* statements on the tape.[287] Nevertheless, the record does not indicate that the taped statements were ever provided to defense counsel and there was no evidence before the state court to support its factual finding that the taped statement was ever provided to defense counsel. Based on the trial record and Respondent's original concession that the state court's factual finding was erroneous, the Court finds the factual finding that the statement was disclosed to the defense before trial to be objectively unreasonable in light of the evidence presented in the state court proceeding.[288]

> ii.   Whether the state court's ruling was contrary to, or an unreasonable application of, clearly established federal law

Petitioner asserts that the February 22, 1999 statement contained the following material inconsistencies with Darby's trial testimony: (1) in his statement, Darby asserts that he did not see Petitioner with a gun when he got out of the car, in contradiction to Darby's trial testimony that Petitioner was carrying a rifle when he got out of the car; (2) discrepancies between the timeline Darby gave at trial and the timeline provided during his statement; (3) in his statement, Darby asserts that he knew Petitioner and Zannie Neal through "a buddy," in contradiction to his trial testimony

---

[285] *Id*. at 197–98.

[286] *Id*. at 200–01.

[287] State Rec., Vol. I of XXXIII at p. 14.

[288] 28 U.S.C. § 2254(d)(1); *Megas*, 281 F. App'x at 335.

that they were his nephews; (4) Darby's statement indicated that Petitioner was a lesser participant than Zannie Neal because Zannie Neal "did the talking" while Petitioner wanted to go get a beer; (5) Darby's statement indicated that he was familiar with the Bunche Village area where the crime occurred, in contradiction to his trial testimony that Petitioner had to provide him with directions.[289] In response, Respondent argues that this evidence is not material because "[r]egardless of any difference in his statements, [P]etitioner is still at the scene and exiting the car outside the scene of the shootings; he is still running to the car carrying a weapon with a ski mask covering his face; he is still in that car in the attempt to escape and he is still shooting at the pursuing police with an AK 47."[290] According to Respondent, the "minor inconsistencies" between the statement and Darby's trial testimony "do not impeach the gist of Darby's statement or his trial testimony that petitioner was armed when he exited the vehicle."[291]

The state trial court did not address whether these statements were material, because it found that the statements were disclosed to the defense. However, as discussed above, Respondent originally conceded that this factual finding was not supported by the record. Accordingly, the factual finding is not entitled to deference.

The Supreme Court's decision in *Wearry v. Cain* is instructive here.[292] There, the State withheld impeachment evidence concerning two of the State's witnesses, Sam Scott and Eric

---

[289] Rec. Doc. 4 at 32–39.

[290] Rec. Doc. 12 at 16.

[291] *Id*. at 17.

[292] 136 S. Ct. 1002 (2016).

Brown.[293]  At trial, Scott was the only witness to testify that he saw Wearry commit the homicide in question and Eric Brown testified that on the night of the murder, he saw Wearry and other individuals with a man who looked like the victim.[294]   Wearry argued that the State withheld the following impeachment evidence: (1) police records containing information that an inmate in the same prison as Scott reported hearing Scott say he would "make sure [Wearry] gets the needle cause he jacked over me"; (2) police records indicating that Scott had tried to coerce another inmate to lie about witnessing the murder; (3) evidence that Brown "had twice sought a deal to reduce his existing sentence in exchange for testifying against Wearry"; and (4) medical records of the victim that could have contradicted Scott's testimony.[295] On appeal, the Supreme Court concluded that "the newly discovered evidence suffice[d] to undermine confidence in Wearry's conviction."[296] The Supreme Court reasoned that "Scott's credibility . . . would have been further diminished had the jury learned that [the victim] may have been physically incapable of performing the role Scott ascribed to him, that Scott had coached another inmate to lie about the murder and thereby enhance his chances to get out of jail, or that Scott may have implicated Wearry to settle a personal score."[297]

As discussed in detail above, the testimony of Darby was the only evidence supporting the State's theory of the crime. Darby testified that Petitioner was holding a rifle when he exited the car with Zannie Neal. According to Darby, when they returned, Petitioner made inculpatory statements

---

[293] *Id.* at 1003.

[294] *Id.*

[295] *Id.* at 1004–05.

[296] *Id.* at 1006.

[297] *Id.* at 1006–07.

suggesting that he had been the shooter. The eyewitness testimony of Claudette Hurst did not match the physical description of Petitioner and instead matched Darby. The prior inconsistent statements made by Darby, particularly the statement indicating that Darby did not see a gun when Petitioner exited the vehicle, would have been critical to impeach his testimony. When viewed cumulatively with the forensic and serology reports discussed above, there may be a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.[298]

However, this issue cannot be resolved without an evidentiary hearing. The state court's decision denying relief rested on the factual finding that the recorded statement disclosed to the defense. As discussed above, there may be a basis to find that the state court's factual finding was objectively unreasonable and not entitled to deference. "A district court may refuse an evidentiary hearing where there is not a factual dispute which, if resolved in the prisoner's favor, would entitle him to relief."[299] Here, the factual dispute, if resolved in Petitioner's favor, would entitle him to relief. Therefore, a hearing on this issue is necessary.

<em>c.      Evidence the State Court Found was not Disclosed to Defense Before Trial</em>

The state trial court found that three pieces of evidence were not disclosed to the defense before trial: (1) a January 1999 letter from Zannie Neal to Arthur Darby; (2) the police record of Keinna Porter; and (3) supplemental police reports.[300] Each of these items is described in turn.

---

[298] *Bagley*, 473 U.S. at 682.

[299] *Coleman*, 963 F.3d at 435–36 (internal citations omitted).

[300] State Rec., Vol. XX of XXXIII, Order Denying Application for Post-Conviction Relief at p. 2, Oct. 9, 2013.

i.      The Letter from Zannie Neal to Arthur Darby

Zannie Neal sent a letter to Arthur Darby in January 1999, while both were incarcerated. In the letter, Zannie Neal expressed that he would like to make a "fresh start" if they "both make it out of here together"[301] The letter also states that "once this is all over" Zannie and Darby could explain to their family that they got into drug dealing because they wanted the "good life" and wanted to show their family "what the good life is like."[302] On post-conviction review, the state trial court found Petitioner's claim that the letter "contain[ed] *Brady* material" to be "speculative in nature" and without "factual basis."[303]

Petitioner now argues that this letter is exculpatory and constitutes impeachment evidence.[304] Petitioner asserts that the letter could have been used to show that Darby "could have easily chosen Jarrell over Zannie to inculpate due to his close personal relationship with Zannie."[305] In response, Respondent argues that the letter inculpates Petitioner because the letter suggests Zannie Neal understood that Petitioner would not be getting out of jail.[306] Respondent also asserts that the letter

---

[301] Rec. Doc. 4-1 at 149 ("That's why I was thinking to myself that man if we both make it out of here together. I'm coming with you to Texas so I could have a brand new start. Because really my nigga you bout the only person I know period that's on the same level with me. Then you like a couple of level's above me. Because ain't nobody else really feeling me.").

[302] *Id.* at 149–50 ("So say bra once this is all over me and you can go back out there and really put it down. You know let our people's know just what it was we was trying to do. Which really was just trying to make something strong and positive happen so we can show our real folks what the good life is like. Because once we been exposed we want that, if not for ourselves for them. Just like when you graduated from O.I.L. They thought we was trippin spending all that money on a plate of food That was because at that time we really didn't have our stuff together, but once we get it together we can show them that it ain't bout nothing. Because nigga you got skills to pay the bills. And say nigga you always my inspiration so it's a must that I represent with you.").

[303] *Id.*

[304] Rec. Doc. 4 at 40.

[305] *Id.*

[306] Rec. Doc. 12 at 19.

shows that Zannie Neal had an unrealistic sense of reality because he expressed a belief that he may "make it out."[307]

The letter could have been used to show Zannie Neal had a close relationship with Arthur Darby. This supports Petitioner's theory that Arthur Darby lied to protect himself and Zannie Neal. When viewed alone, this undisclosed evidence would not undermine confidence in the jury's verdict. However, the cumulative effect is addressed below.

ii.   Criminal History of Keinna Porter

At Petitioner's trial, defense counsel indicated that he had not received a rap sheet for the State's witness Keinna Porter, and the prosecutor responded that "to [his] knowledge, this witness has no arrests; has never even been arrested before."[308] However, on post-conviction relief, Petitioner discovered records showing that Porter was arrested in Jefferson Parish and charged with possession of cocaine in January 1999.[309] Porter later pleaded guilty to possession of cocaine in violation of Louisiana Revised Statute § 40:967(C), (F).[310] The judge sentenced Porter to a term of one year imprisonment, suspended the sentence, and placed her on probation.[311] On post-conviction review, the state trial court found that the evidence was not material because "[Porter] pled as charged and did not receive a reduced sentence. There is nothing in the record to suggest that there was a deal with Porter in exchange for her testimony or that she benefited from testifying at trial."[312]

---

[307] *Id*. at 19–20.

[308] Feb. 25, 1999 Trial Transcript at p. 133.

[309] State Rec., Vol. XI of XXXIII, Exhibit 17 to Supplemental Petition at pp. 318–20.

[310] *Id*.

[311] *Id*.

[312] *Id*.

Petitioner argues that these records suggest that Porter may have received a plea deal in exchange for her testimony. At the time of Porter's conviction, Louisiana Revised Statute § 40:967(F) provided for the imposition of mandatory minimum sentences if certain amounts of cocaine were possessed.[313] Additionally, the statute provided that where the provisions of Subsection F are applicable, "the adjudication of guilt or imposition of sentence shall not be suspended, deferred, or withheld, nor shall such person be eligible for probation or parole prior to serving the minimum sentences provided by Subsection F."[314] The minutes from Porter's case also reveal that the prosecutor was Quentin Kelly, who also prosecuted Petitioner's case.[315] Under these circumstances, Petitioner argues that "it is apparent that the State gave favorable treatment to Porter in her criminal case in exchange for her testimony."[316]

Petitioner contends that the withheld impeachment information is material.[317] At Petitioner's trial, Porter testified that Franklin McQueen, who allegedly owed a drug debt to Zannie Neal, was living at Claudette Hurst's home but left "[a] couple of days before the incident happened."[318] Petitioner argues that the undisclosed evidence could have been used to call Porter's credibility into doubt.[319] Additionally, Petitioner argues that the undisclosed evidence shows that Porter "had a

---

[313] La. Rev. Stat. § 40:967(F) (1998).

[314] *Id*. at § 40:967(G) (1998).

[315] State Rec., Vol. XI of XXXIII, Exhibit 17 to Supplemental Petition at pp. 318–20.

[316] Rec. Doc. 4 at 42.

[317] *Id*.

[318] Feb. 25, 1999 Trial Transcript at pp. 141–42.

[319] Rec. Doc. 4 at 42.

possible personal interest in testifying to curry favor with the State."[320] In response, Respondent contends that the prosecutor may not have been aware of Porter's arrest, which occurred six weeks before she was called as a witness in Petitioner's trial.[321] Respondent notes that Porter was not charged until April 20, 2000, over a year after Petitioner's trial, and she pleaded guilty as charged.[322]

Keinna Porter's trial testimony was very limited. The testimony supported the State's theory on motive for the crimes—Zannie Neal went to the house because Franklin McQueen owed him a drug debt. Porter testified that Franklin McQueen was living in the home on S. Wilson Street but left a few days before the shooting.[323] Similar testimony regarding Franklin McQueen was also provided by Claudette Hurst and Carl Duncan.[324] Therefore, Porter's testimony was cumulative. Even assuming Petitioner's argument that Porter got a plea deal in exchange for her testimony is true, it cannot be said that the result of the trial would have been different if the jury would have known that information. Individually, this undisclosed evidence does not undermine confidence in the jury's verdict. However, the cumulative effect is addressed below.

### iii.    Police Reports

Petitioner argues that the State failed to disclose the investigating police officers' initial reports before trial, as required by Louisiana law.[325] On direct appeal, the Louisiana Supreme Court found that any failure to disclose initial police reports was harmless error because Petitioner did not

---

[320] *Id.*

[321] Rec. Doc. 12 at 20.

[322] *Id.* at 91, 115–16.

[323] Feb. 25, 1999 Trial Transcript at pp. 141–42.

[324] Feb. 25, 1999 Trial Transcript at pp. 141–42.

[325] Rec. Doc. 4 at 42.

show how the defense was prejudiced.[326] On post-conviction review, the state trial court found that the initial police report was provided to the defense and noted that "[a]dditional reports which are investigative or supplemental in nature are not required to be produced until the conviction becomes final."[327]

Defense counsel was provided with an initial report authored by Lieutenant Buras mid-trial but Petitioner contends that the initial report was inconsistent with a supplemental report that was not provided to the defense before trial.[328] Petitioner contends that the supplemental report shows the State's bias in investigating this case as it "composed a report that fit with the State's theory of the crime rather than with the evidence." [329] Petitioner asserts that the facts excluded from the supplemental report could have facilitated defense counsel's investigation of the case.[330] In response, Respondent asserts that any claim regarding the alleged failure to comply with Louisiana law is not cognizable on federal habeas review. [331] Additionally, Respondent notes that the record shows Petitioner was provided with the initial report—the only report he was entitled to under Louisiana law.[332]

As the Fifth Circuit has recognized, "federal habeas courts sit to review state court

---

[326] State Rec., Vol. XXI of XXXIII, *State v. Neal*, 00-KA-0674, Unpublished Appendix at p. 43 (La. 6/29/2001).

[327] *Id*.

[328] Rec. Doc. 4 at 43.

[329] *Id.*

[330] *Id.* at 44.

[331] Rec. Doc. 12 at 21.

[332] *Id*. at 22.

misapplications of federal law."[333] "A federal court lacks authority to rule that a state court incorrectly interpreted its own law."[334] "Whether the state followed its own procedure is not the concern of a federal habeas court."[335] Therefore, to the extent Petitioner argues that the prosecution violated state law by failing to disclose the police reports, this claim is not cognizable on federal habeas review.

Under federal law, Petitioner generally alleges that the supplemental report shows "that the State was biased in its investigation of this case, and composed a report that fit with the State's theory of the crime rather than with the evidence."[336] Petitioner does not explain how this undisclosed evidence is material or how it would undermine confidence in the jury's verdict.

### d.    Cumulative Effects of the Evidence

For clarity due to the detailed facts surrounding each sub-issue listed above, each alleged piece of *Brady* material was addressed individually. However, the effect of *Brady* violations must be viewed cumulatively. "When there are a number of *Brady* violations, a court must analyze whether the cumulative effect of all such evidence suppressed by the government raises a reasonable probability that its disclosure would have produced a different result."[337]

As the Supreme Court has made clear, "the materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence,

---

[333] *Charles v. Thaler*, 629 F.3d 494, 500 (5th Cir. 2011).

[334] *Id*. at 500–01.

[335] *Manning v. Warden, Louisiana State Penitentiary*, 786 F.2d 710, 712 (5th Cir. 1986).

[336] Rec. Doc. 4 at 43.

[337] *Sipe*, 388 F.3d at 478.

the remaining evidence is sufficient to support the jury's conclusions.[338] "Rather, the question is whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'"[339]

Petitioner argues that "the net weight of the *Brady* material suppressed by the State is staggering."[340] Petitioner asserts that "without a doubt . . . had the jury heard the entirety of the exculpatory evidence the State withheld and continues to suppress, there is a reasonable probability that the outcome of the proceedings would be different."[341]

Respondent contends that Petitioner is not entitled to relief because no individual *Brady* claim has merit.[342] According to Respondent, habeas relief should be denied because Petitioner cannot show that any of the suppressed evidence is material.[343] Respondent argues that "Darby would not have been 'severely impeached' if the jury knew he had given a statement in which he said he did not see petitioner with a gun when petitioner got out of the car."[344] Similarly, Respondent argues that the possible presence of a minuscule drop of blood on Darby's shoe cannot "be considered material on this record."[345] Respondent cites Supreme Court caselaw recognizing that "evidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence

---

[338] *Strickler*, 527 U.S. at 290(citing *Kyles*, 514 U.S. at 434–35).

[339] *Id*. (quoting *Kyles*, 514 U.S. at 435).

[340] Rec. Doc. 4 at 248.

[341] *Id*. at 249.

[342] Rec. Doc. 12 at 121.

[343] *Id*. at 23.

[344] *Id*.

[345] *Id*.

in the verdict."[346] Respondent submits that the other evidence presented in Petitioner's case is sufficient to maintain confidence in this verdict.[347]

In support, Respondent cites *Strickler v. Greene*.[348] In *Strickler*, the Supreme Court considered a *Brady* claim that involved exculpatory evidence that would have cast doubt on the testimony of a key prosecution witness, Anne Stoltzfus.[349] When the United States Court of Appeals for the Fourth Circuit considered the case, it concluded that "without considering Stoltzfus' testimony, the record contained ample, independent evidence of guilt, as well as evidence sufficient to support the findings of vileness and future dangerousness that warranted the imposition of the death penalty."[350] The Supreme Court rejected this approach.[351] The Supreme Court reiterated that "the materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions."[352] Instead, "the question is whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'"[353]

Still, the *Strickler* Court concluded that habeas relief was not warranted because "[t]he record provide[d] strong support for the conclusion that petitioner would have been convicted of capital

---

[346] *Id*.

[347] *Id*.

[348] 527 U.S. 263 (1999).

[349] *Id*. at 266.

[350] *Id*. at 290.

[351] *Id*. ("T]he standard used by [the Fourth Circuit] was incorrect.").

[352] *Id*.

[353] *Id*. (quoting *Kyles*, 514 U.S. at 435).

murder and sentenced to death, even if Stoltzfus had been severely impeached."[354]   Specifically, there was "considerable forensic and other physical evidence linking [the defendant] to the crime."[355] Moreover, Stoltzfus's testimony "did not relate to [the petitioner's] eligibility for the death sentence and was not relied upon by the prosecution at all during its closing argument at the penalty phase."[356] Therefore, the Supreme Court concluded that there was not "a reasonable probability that the jury would have returned a different verdict if [Stoltzfus's] testimony had been either severely impeached or excluded entirely."[357]

    This case is clearly distinguishable from *Strickler*. To convict Petitioner of first-degree murder under Louisiana law, the prosecution had to prove that Petitioner had the specific intent to kill the victims or to inflict great bodily harm.[358]   The prosecution also had to prove that at least one aggravating circumstance was met.[359]   In this case, the prosecutors argued the following aggravating circumstances: (1) Petitioner was engaged in the perpetration or attempted perpetration of an aggravated burglary; (2) Petitioner was engaged in the attempted distribution, exchange, sale or purchase of a controlled dangerous substance; and (3) Petitioner knowingly created a risk of death or great bodily harm to more than one person.[360]   The jurors found each of these aggravating

---

[354] *Id*. at 294.

[355] *Id*. at 293.

[356] *Id*. at 295.

[357] *Id*. at 296.

[358] La. Rev. Stat. § 14:30. Louisiana law defines specific criminal intent at the "state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. Rev. Stat. § 14:10(1).

[359] La. Rev. Stat. § 14:30.

[360] *Neal*, 796 So. 2d at 657 (internal citations omitted).

circumstances present in this case.[361]

The State relied primarily on the testimony of Arthur Darby to prove each of these three aggravating circumstances.[362] To prove that Petitioner committed the murders while engaged in the perpetration or attempted perpetration of an aggravated burglary, the State relied on Arthur Darby's testimony that Petitioner "went to the Hurst residence with the intent to collect an unpaid drug debt and that he entered the house armed with an AK-47."[363] "Similarly, to prove that [Petitioner] killed the victims during the course of a drug transaction, the [S]tate relied heavily on Darby's testimony that they went to the Hurst residence to collect an overdue drug debt from Claudette Hurst's stepfather."[364] Finally, to prove that Petitioner created a risk of death or serious bodily harm to more than one person, the State relied on evidence showing that Petitioner "used a high powered assault rifle to shoot indiscriminately through the bedroom door at a group of people."[365] The testimony of Arthur Darby was the only evidence presented to show that Petitioner was the shooter.[366]

"[T]he impeached testimony of a witness whose account is strongly corroborated by additional evidence supporting a guilty verdict . . . generally is not found to be material."[367] "Conversely, a *Brady* violation is more likely to occur when the impeaching evidence would seriously undermine the

---

[361] State Rec., Vol. XXI of XXXIII, *State v. Neal*, 00-KA-0674, Unpublished Appendix at p. 65 (La. 6/29/2001).

[362] *Id*.; *Neal*, 796 So. 2d at 657–58.

[363] State Rec., Vol. XXI of XXXIII, *State v. Neal*, 00-KA-0674, Unpublished Appendix at p. 65 (La. 6/29/2001).

[364] *Id*. at 66.

[365] *Id*.

[366] *Neal*, 796 So. 2d at 658.

[367] *Rocha*, 619 F.3d at 396–97 (internal citations and quotation marks omitted).

testimony of a key witness on an essential issue or there is no strong corroboration."[368] Unlike in *Strickler*, this record does not provide "strong support for the conclusion that petitioner would have been convicted of capital murder and sentenced to death" if Darby had been "severely impeached."[369]

In portions of its briefing, Respondent appears to concede that the allegedly suppressed evidence could be material to Petitioner's punishment. For example, Respondent points out that "any merit to [the *Brady*] claim can only result in relief as to the degree of culpability, i.e., his death sentence: petitioner cannot escape the resulting life sentence for second degree murder due to his involvement as a principal for his involvement in these murders."[370] *Brady* recognizes that "suppression by the prosecution of evidence favorable to an accused [] violates due process where the evidence is material either to guilt or to punishment."[371] In *Brady*, the petitioner and a companion, Boblit, were both convicted of first degree murder and sentenced to death.[372] Brady's defense at trial was that he was a participant in the crime but Boblit was the killer.[373] Following trial, Brady's attorney discovered a prior statement by Boblit wherein he admitted to being the killer.[374] The Supreme Court held that although Boblit's statement did not exculpate Brady of the murder under Maryland law, it was material to the question of punishment.[375]

---

[368] *Id*. at 397 (internal citations and quotation marks omitted).

[369] *Strickler*, 527 U.S. at 294.

[370] Rec. Doc. 12 at 10.

[371] 373 U.S. at 87.

[372] *Id*. at 84.

[373] *Id*.

[374] *Id*.

[375] *Id*. at 88.

57

To succeed on his *Brady* claim, Petitioner must show that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."[376] "A reasonable probability does not mean that the defendant would more likely than not have received a different verdict with the evidence, only that the likelihood of a different result is great enough to undermine [] confidence in the outcome of the trial."[377] When viewed cumulatively, there is a reasonable probability that the result of the proceeding would have been different if Arthur Darby's testimony were impeached with the forensic reports, the serology report, the prior inconsistent statement, and the letter from Zannie Neal. However, as discussed above, there is a factual dispute over whether certain items were disclosed to the defense before trial. Therefore, summary judgment is not appropriate on this issue. Instead, this factual issue must be resolved after an evidentiary hearing.[378]

## B.   *Ineffective Assistance of Counsel*

In the alternative, Petitioner contends that he is entitled to habeas relief because even if the reports were provided, defense counsel would have been ineffective if he had the reports and failed to use them at trial.[379] Petitioner argues that his trial counsel had a duty to consult with independent

---

[376] *Bagley*, 473 U.S. at 682.

[377] *Smith*, 565 U.S. at 75 (quoting *Kyles*, 514 U.S. at 434).

[378] The Supreme Court's holding in *Cullen v. Pinholster* "prohibits a federal court from using evidence that is introduced for the first time at a federal-court evidentiary hearing as the basis for concluding that a state court's adjudication is not entitled to deference under § 2254(d)." *See Blue v. Thaler*, 665 F.3d 647, 656 (5th Cir. 2011) (citing *Cullen v. Pinholster*, 563 U.S. 170 (2011)). However, if the state court's decision was based upon an unreasonable determination of the facts, the Court is not constrained by the record before the state court and may consider evidence presented for the first time in federal court. *Cullen*, 563 at 185–86. *See also Hurles*, 752 F.3d at 778. For the reasons discussed above, the Court finds that the state court's factual findings that the forensic reports, the serology report, and the prior statements of Arthur Darby to be objectively unreasonable in light of the evidence presented to the state court.

[379] Rec. Doc. 166-1 at 25.

forensic experts, both to potentially present in the defense's case and to properly cross-examine the State's experts.[380] Petitioner asserts that this Court need not resolve the question of whether the prosecution disclosed the reports because *Brady's* "materiality" standard "is identical to" the prejudice standard for ineffective assistance of counsel claims.[381] According to Petitioner, "[w]hether the reports were disclosed or withheld, the outcome is the same: Mr. Neal's conviction and death sentence are unworthy of confidence."[382] Respondent did not respond to this argument in opposition to the instant motion for summary judgment.

To succeed on an ineffective assistance of counsel claim, a petitioner must demonstrate both that counsel's performance was deficient and that the deficient performance prejudiced his defense.[383] If a court finds that a petitioner fails on either of these two prongs it may dispose of the ineffective assistance claim without addressing the other prong.[384] To satisfy the deficient performance prong, a petitioner must overcome a strong presumption that the counsel's conduct falls within a wide range of reasonable representation.[385] A petitioner must show that the conduct was so egregious that it failed to meet the constitutional minimum guaranteed by the Sixth Amendment.[386] Courts addressing this prong of the test for ineffective counsel must consider the reasonableness of counsel's actions in

---

[380] *Id*.

[381] *Id*. at 26 (quoting *Johnson*, 68 F.3d at 109–10).

[382] *Id.*

[383] *Strickland v. Washington*, 466 U.S. 668, 697 (1984).

[384] *Id.* at 697.

[385] *See Crockett v. McCotter*, 796 F.2d 787, 791 (5th Cir. 1986); *Mattheson v. King*, 751 F.2d 1432, 1441 (5th Cir. 1985).

[386] *See Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001).

light of all the circumstances.[387] To prevail on the actual prejudice prong, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[388] A reasonable probability is "a probability sufficient to undermine confidence in the outcome."[389]

In considering Petitioner's claims on federal habeas corpus review that are repetitive of claims already made to a state court, the central question "is not whether a federal court believes the state court's determination under *Strickland* was incorrect but whether [it] was unreasonable—a substantially higher threshold."[390] In addition, "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard."[391] Thus, this standard is considered "doubly deferential" on habeas corpus review.[392]

Petitioner raises the ineffective assistance of counsel claim as an alternative theory for relief. Petitioner maintains his argument that the serology and forensic reports were not disclosed to the defense before trial. However, assuming that the evidence was disclosed, Petitioner argues that his counsel was ineffective for failing to use the evidence. Petitioner does not cite, and the Court has been unable to locate, any authority that would allow the Court to grant habeas relief in the equivocal manner argued for by Petitioner. The purpose of an evidentiary hearing is to develop the record so that the Court can make a factual determination of what actually happened. As the Fifth Circuit has

---

[387] *See Strickland*, 466 U.S. at 689.

[388] *Id*. at 694.

[389] *Id*.

[390] *Knowles v. Mirzayance*, 556 U.S. 111, 112 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 478 (2007)).

[391] *Id*.

[392] *Id*.

recognized, "[a] district court may refuse an evidentiary hearing where there is not a factual dispute which, if resolved in the prisoner's favor, would entitle him to relief."[393] An evidentiary hearing is needed to resolve the factual dispute in this case.

## **V. Conclusion**

For the reasons discussed above, the Court denies the motion for partial summary judgment. The state court made a factual finding that the serology report, the forensic report, and the statement of Arthur Darby were disclosed to the defense. The Supreme Court's holding in *Cullen v. Pinholster* "prohibits a federal court from using evidence that is introduced for the first time at a federal-court evidentiary hearing as the basis for concluding that a state court's adjudication is not entitled to deference under § 2254(d)."[394] However, if the state court's decision was based upon an unreasonable determination of the facts, the Court is not constrained by the record before the state court and may consider evidence presented for the first time in federal court.[395] For the reasons set forth above, the Court finds the state court's factual findings that the forensic reports, the serology report, and the prior statements of Arthur Darby were disclosed to the defense to be objectively unreasonable in light of the evidence presented to the state court. Therefore, an evidentiary hearing is needed to determine whether the forensic reports, the serology report, and the statement of Arthur Darby were disclosed to the defense before trial. Accordingly,

---

[393] *Coleman*, 963 F.3d at 435–36.

[394] *Blue*, 665 F.3d at 656 (citing *Cullen*, 563 U.S. at 170).

[395] *See Cullen*, 563 U.S. at 185–86; *see also Hurles*, 752 F.3d at 778.

**IT IS HEREBY ORDERED** that Petitioner Jarrell Neal's "Motion for Partial Summary Judgment"[396] is **DENIED.**

**IT IS FURTHER ORDERED** that an evidentiary hearing will be held on the issue of whether the forensic reports, the serology report, and the statement of Arthur Darby were disclosed to the defense before trial.

**NEW ORLEANS, LOUISIANA,** this 30th day of March, 2021.

_Nannette Jolivette Brown_

**NANNETTE JOLIVETTE BROWN**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

---

[396] Rec. Doc. 166.